

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 10, 2025

**BY ECF**
The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Wilson Mendez*, S7 22 Cr. 293 (JPO)

Dear Judge Oetken:

      The Government respectfully submits this letter in advance of the January 17, 2025, sentencing of defendant Wilson Mendez.

      As a member of the violent street gang "Own Every Dollar" ("OED"), the defendant attempted to kill rival drug traffickers, committed two gunpoint robberies, and sold fentanyl. The stipulated Guidelines range (the "Stipulated Guidelines Range") is 219 to 252 months imprisonment, with a mandatory minimum term of imprisonment of 144 months. A sentence within the Stipulated Guidelines Range is sufficient but not greater than necessary to serve the purposes of sentencing.

**I.   OED**

      Own Every Dollar ("OED") is a subset of the Trinitarios street gang and operates primarily in the Washington Heights area of Manhattan. Similar to other Trinitarios gangs, OED has an oath, formal precepts, and rules. Among the rules are, for example, a code of silence, a rule that members of OED are members until death, and a rule that anyone who disrespects OED must be punished.

      Members of OED are also required to carry out the orders of those in positions of authority within OED—referred to as "missions." The head of the gang is referred to as the "Duarte" or the "Big Homie," and can authorize murders and give orders to other members. The second in command of the gang is the "Disciplina," in charge of enforcing the OED rules and dictates punishments for failures to carry out orders. The third in command of the gang is the "Casco Negro" (black helmet), in charge of security for the gang, including securing weapons. OED maintains a similar hierarchy inside the prison system.

      OED also uses various codes and signals, both in person and on social media. For example, the letter "O," the emoji depicting a circle, and a hand sign in the shape of "O" are all short for "OED," and are used to represent OED. OED also uses the color green, a color frequently used by Trinitarios, and the emoji of a green heart, to represent OED. Further, OED uses number codes

such as "880" (someone has been shot) or "1844" (a direction to cut or shoot someone). OED also has its own logo and members of OED frequently post the logo on social media or wear branded clothing with the logo. Members of OED frequently boast in social media and in person about their status in the gang, the amount of cash they possess (obtained from committing crimes on behalf of OED), and their possession of luxury goods purchased with those proceeds.

OED members frequently engaged in violence with rival criminal street gangs, such as the Amsterdam Broadway Bullies ("ABB"), who are located in the vicinity of 135th Street and Broadway. On multiple occasions, members of OED traveled to ABB territory and shot at members of the rival gang. Members of OED have also shot at rival narcotics traffickers in order to protect OED's trafficking territory.

For years, members of OED have terrorized New Yorkers, inflicting devastating violence with little regard for its impact on their community. The defendants in this case are charged with carrying out a stunning number of acts of violence as members of OED, including five murders, twelve attempted murders, and a number of robberies.

Additionally, OED controlled a narcotics-trafficking organization that distributed fentanyl, heroin, cocaine, crack cocaine, oxycodone, ecstasy, and marijuana. The narcotics trafficking operation included a 24-hours-a-day, seven-days-a-week system in which OED members and associates sold, among other things, heroin laced with fentanyl on OED-controlled street corners in Washington Heights. OED members used written drug schedules in which OED members sold drugs in eight-hour shifts determined by their narcotics supervisors.

Law enforcement agents conducted multiple undercover purchases of narcotics from the defendants, and several of the defendants were previously arrested while in possession of narcotics. OED's trafficking involved huge numbers of hand-to-hand retail sales, which cumulatively added up to many kilograms of narcotics—a clear indication that OED members had access to distribution quantities of dangerous drugs. For example, on February 24, 2022, codefendant Justin Deaza was arrested in possession of one kilogram of fentanyl, which was likely intended to be broken down into individual glassine envelopes and sold by OED in Washington Heights.

## II.   THE DEFENDANT'S OFFENSE CONDUCT

The defendant sold fentanyl in shifts on behalf of OED, and he is being held responsible for the trafficking of between 400 grams and 1.2 kilograms of fentanyl. He frequently carried firearms in connection with his drug trafficking.

On May 13, 2020, rival narcotics traffickers forced Justin Deaza, a fellow OED member, to stop selling drugs in a particular location. The rival narcotics traffickers operated out of a van they kept on West 184th Street. In retaliation, later that night, the defendant and Deaza returned to West 184th Street and Audubon Avenue and fired multiple rounds at the rival narcotics traffickers while they were in the van.

On December 13, 2020, the defendant and other OED members committed a gunpoint robbery of a victim as he left a restaurant on 188th Street and Saint Nicholas Avenue in New York, NY. They stole a gold chain from the victim.

In September 2021, the defendant and two other OED members committed a gunpoint robbery of a victim as he left a nightclub in Queens County, NY. During the robbery, one of the assailants told he victim, ""give me the [expletive] chain or I'll shoot you," and ripped a chain off the victim's neck. Law enforcement reports note that the assailants were seen ditching firearms near the scene, two of which were recovered by police shortly thereafter. . This, in addition to the above chain robbery, were part of a pattern of OED robberies that occurred over the course of 2020 and 2021 during which OED targeted patrons of high-end restaurants. Of the related robberies, the defendant also participated in the August 19, 2020 robbery of a 30-year old man as he exited a downtown restaurant. In that instance, the defendant and others stole approximately $100,000 and Rolex watch before fleeing from police during a high-speed chase during which the fleeing vehicles nearly hit several pedestrians and drew gunfire from police, endangering the lives of several bystanders.[1]

## III. CRIMINAL HISTORY

The defendant has no prior convictions, but was previously arrested on September 8, 2020 in possession of two loaded firearms and a quantity of marijuana.  PSR ¶ 153.

## IV. JAIL MISCONDUCT

Since their arrests in this case, members of OED, including this defendant, have engaged in persistent misconduct while incarcerated at the Metropolitan Detention Center – Brooklyn ("MDC"), as well as other local facilities including Essex Correctional Center and Hudson County Corrections and Rehabilitation Center. OED members have assaulted inmates, facilitated contraband smuggling, possessed and distributed contraband (including cellphones, weapons, and narcotics), and used narcotics. Just as they sowed chaos in Washington Heights, so too have they destabilized local prison populations.

The presence of contraband in jail contributes directly to unsafe conditions that require increased staffing, cause more frequent lockdowns, and increase unpredictability. *See, e.g., United States v. Chavez*, 22 Cr. 303 (JMF), Dkt. 31 at n.4 (describing the ways in which contraband at the MDC makes the conditions at that facility worse). Even pieces of contraband that can be viewed as relatively harmless outside of a jail (items like marijuana and tobacco) are drivers of violence in jail where they contribute to the market for contraband goods, which generates conflict over sources of supply and debts, which then leads to violence. Just as competition fueled by drug dealing profits drives violence in the streets, so it does in jail.

A common piece of contraband — cellphones — pose a particularly concerning danger in prison as defendants, like those charged in this case, seek to continue to control their criminal

---

[1] https://nypost.com/2021/10/13/suspect-in-nyc-high-end-thefts-charged-with-gun-possession/

organizations from inside prison. *See, e.g.*, *United States v. McBean, et al.*, S2 24 Cr. 541 (AT) (murder-for-hire plot resulting in death of an innocent bystander orchestrated using a contraband cellphone from inside MDC).

This defendant engaged in a pattern of misconduct in jail that included use and possession of narcotics (marijuana and ecstasy), possession of a cellphone, possession of weapons, and failure to follow orders. The defendant's conduct evinces a lack of remorse and a serious need for specific deterrence. In particular, among other infractions, the defendant was found guilty of the following offenses between May 2023 and November 2024:

- On or about May 12, 2023, the defendant used his mattress to barricade his cell door creating a security risk by blocking the food slot which is described as "an essential security device needed to access the cell during an emergency." The defendant refused to participate in the subsequent disciplinary proceedings during which CCTV footage was reviewed and the defendant was found guilty and received disciplinary sanctions.

- On or about October 18, 2023, MDC officials searched a cell occupied by Mendez and Nunez Jr.. During the search, MDC officials recovered an iPhone wrapped inside a gray homemade pouch concealed in the compartment inside the toilet paper holder tray. The defendant was found guilty after a hearing and received disciplinary sanctions. The Government sought a search warrant for the phone and discovered significant evidence allowing the Government to conclude that, for at least a significant portion of time, the defendant controlled the phone. For example, the phone was logged into a SnapChat account with the username "Tati TheOpp!!," which is Mendez's SnapChat account. Mendez was logged into the account from the seized phone during his period of incarceration, beginning in early August 2023 through at least September 19, 2023. During the same period that Mendez's SnapChat account was active on the phone recovered from his cell, many photographs were saved to the phone. For example, as depicted below right, on or about August 26, 2023 an image of bulk contraband appeared on the phone. Similar photos, below middle and right, of bulk contraband including cigarettes, phone charges, and phones, was saved to the device on or about October 6, 2023 – just before it was seized from Mendez and Nunez Jr.





In addition, and perhaps most strikingly, the phone contained a photograph of a report produced by Rikers island of an attack on an inmate whom members of OED believe to have been cooperating with the Government.

- On or about February 21, 2024, MDC officials conducted a search of a cell occupied by Mendez and an indicted member of a separate Washington Heights drug-dealing crew. During the search, the MDC officials recovered (i) two bags of ecstasy pills, (ii) two bags of marijuana, and (iii) a 2.5 inch ceramic blade. All of the items were found concealed under the toilet. The defendant declined to make a comment during the related disciplinary hearing. The defendant was found guilty after a hearing and received disciplinary sanctions. Photographs of the contraband seized in connection with this offense are included below:





- On or about July 24, 2024, MDC officials conducted a search of a cell occupied by Mendez. During the search, MDC officials seized a sharpened metal object, which was approximately 6.5 inches long, from the bottom bunk mattress, which belonged to Mendez. A photograph of the weapon is included below. The defendant was found guilty after a hearing during which he declined to provide a statement. The defendant received disciplinary sanctions.



- Three days after his previous infraction, on or about July 27, 2024, while packing Mendez's cell, MDC officials recovered a homemade weapon from a chair in the common area of the cell. The weapon was the 9-inch piece of sharpened metal depicted below. The defendant was found guilty after a hearing during which he declined to provide a statement. The defendant received disciplinary sanctions.



- On or about November 24, 2024, the defendant tested positive for marijuana use.

## V. SHAM COGNITIVE IMPAIRMENT

Since his arrest, the defendant has tried to defraud the Court and his own attorneys by pretending to be mentally incompetent. Defense counsel filed a letter on December 13, 2023, seeking a mental health evaluation, in light of their own observations of the defendant. Dkt. 362. The Court ordered a competency evaluation on January 22, 2024, dkt. 389, and that evaluation was performed by Dr. Cheryl Paradis. The Government submitted a copy of Dr. Paradis's report to the Court under seal on June 11, 2024. Dkt. 426.

Dr. Paradis concluded that the defendant was in fact mentally competent. More significantly, Dr. Paradis concluded that "there is no indication that he suffered a significant head injury," but instead that he "appeared to be feigning or exaggerating cognitive impairment." As to a number of the tests that Dr. Paradis gave to him, she concluded that his performance indicated that he "is not putting forth maximum effort and is likely malingering," and "was almost certainly

feigning a memory or cognitive impairment on this test." Dr. Paradis's report also cited a number of BOP medical notes establishing that the defendant was faking his cognitive impairment. One medical note in the BOP records from June 16, 2023 is particularly significant in demonstrating the defendant's malingering, and it is reproduced below:

> Inmate presented with no complaints of any acute symptoms and no complaints that would point toward acute head trauma.
>
> When asked what year it was, he stated that he it was 2023?
>
> When asked for his name he laughed and stated his name.
>
> When asked where he was, he stated, "I don't know where I am at?"
>
> When asked what happened yesterday, he failed to recall that he went to court and flatly stated, "I be in my cell all day."
>
> The combination not recalling his time in court along with flat affect was how the inmate presented while in the exam room.
>
> The inmate [w]as dismissed from the exam room; I noticed that the inmate began to have a conversation with someone, right outside of the office, that he knew from another unit. Where his affect and demean[o]r had made a complete change[], I observed for several minutes him talk loudly, in a different cadence and dynamic level while responding to prompts, waving his hands up and down, overall seeming completely oriented during his conversation with his friend from a different unit. He did not stop his conversation until his unit officer called him back to the unit.
>
> With the combination of a normal exam and my observations of him when he left my office, it is my medical opinion he was "unresponsive" in court by his own choice to not participate in his court appearance. He clearly has the ability to talk and respond to whomever, whenever, wherever he feels.

Yet even after Dr. Paradis's report, the defendant appears to have attempted to feign cognitive impairment in the hopes of receiving a lower sentence. The PSR reports that, "During the presentence interview, the defendant was inattentive and unable to answer basic questions regarding his personal information," PSR ¶ 166, and the PSR identified the defendant's sham "memory loss" as one of the bases for a below-Guidelines sentence, PSR p. 43. Instead, his willingness to attempt to defraud the Court should be viewed as evidence of the need for specific deterrence as the defendant continues to display little remorse and no interest in accepting responsibility for his crimes.

**VI. PROCEDURAL HISTORY AND GUIDELINES RANGE**

The defendant was initially charged by complaint and arrested on March 22, 2022. He has been detained since the time of his arrest.

On July 26, 2024, the defendant pleaded guilty pursuant to a plea agreement with the Government to (1) one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); (2) one count of attempted murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(3) and (a)(5); (3) one count of brandishing a firearm in furtherance of that attempted murder, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); (4) two counts of assault in aid of racketeering, for the two gunpoint robberies, in violation of 18 U.S.C. § 1959(a)(3); and (5) one count of narcotics conspiracy, in violation of Title 21, United States Code, Sections 841(b)(1)(B) and 846.

There is no dispute as to the Guidelines range: the plea agreement and the PSR both calculate the range as 219 to 252 months' imprisonment, with a mandatory minimum term of imprisonment of 12 years. Probation recommends a sentence of 144 months (the mandatory minimum), and that is also the sentence the defendant requests. The defendant is 22 years old and a citizen of the United States.

## VII.   RELATIVE CULPABILITY

In an effort to capture the relative culpability of defendants in the case, the Government has arranged the defendants into three groups—each group including similarly situated defendants. Group One includes defendants charged in the RICO conspiracy who committed or directed the most serious violence in the case and/or held positions of leadership. Group Two includes defendants charged in the RICO conspiracy who committed non-fatal acts of violence and did not occupy positions of leadership. Group Three includes defendants who were charged with narcotics and firearms offenses, but not as members of the RICO conspiracy. Within each group, the defendants are further arranged in *generally* descending order of culpability. The tables below reflect these groups. For those defendants who have plead guilty, the Guidelines calculation applicable to each defendant. The Government will update these tables in future sentencing submissions to reflect the sentences imposed.[2]

As shown below, Wilson Mendez is at the top of group two. He did not hold a position of leadership in OED, nor did he kill or direct other members to kill. Mendez is similar in culpability to Justin Deaza. Mendez pleaded guilty to six counts including the RICO conspiracy and narcotics conspiracy. He also pleaded guilty to a drug-motivated attempted murder as well as two assaults stemming from two gunpoint robberies. Mendez is in criminal history category I but has engaged in persistent misconduct in prison, detailed further above.

**<u>Group 1</u>**

---

[2] The Government reserves the right to reorder defendants as its analysis of the evidence continues in advance of trials in this case.

| Defendant | Age[3] | Counts of Conviction | CHC | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|
| Jowenky Nunez, Jr.*+ | | | | | | |
| Jerrin Pena*+ | | S7; Ct. 1; 35; 42; 43; 44; 46 | I | Life | 120 | |
| Brian Hernandez + | | | | | | |
| Brayan Lloret* | | | | | | |
| Hugo Rodriguez* | | | | | | |
| Jesus Zapata* | | | | | | |
| Mayovanex Rodriguez+ | 29 | S7; Ct 1, 7, 44 | VI | 360-Life | | 300 mo |
| Iyaury Rodriguez-Rosario | | | | | | |
| Jowenky Nunez, Sr. | | | | | | |

**Group 2**

| Defendant | Age | Counts of Conviction | CHC | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|
| Wilson Mendez+ | 22 | S7; Ct. 1; 14; 15; 36; 40; 44 | I | 219-252 mo | 144 mo | |
| Justin Deaza+ | | S7; Ct. 1, 14, 24; 37; 38; 39; 40; 44 | I | 188-235 mo | 120 mo | |
| Elvis Trejo | | | | | | |
| Argenis Tavarez | | S7; Ct. 1; 8; 44 | I | 135-168 mo | 120 mo | |
| Johann Zapata | | S7; Ct 1; 44 | I | 87-108 mo | n/a | |
| Steven Joaquin | 21 | S7; Ct. 1 | II | 108-135 mo | | 36 mo |

**Group 3**

| Defendant | Age | Counts of Conviction | CHC | Guidelines Range | Man. Min. | Sentence Imposed |
|---|---|---|---|---|---|---|
| Jesus Gonzalez+ | 26 | S4; Ct. 1 | V | 84-105 mo | n/a | 84 mo |
| Daniel Vegas | | S4; Ct. 1 | V (CO) | 70-87 mo | n/a | 36 mo |
| Anthony Castillo | 30 | S4; Ct. 1 | III | 57-71 mo | n/a | 36 mo |
| Albert Lantigua | 29 | S3; Ct. 1 | I | 36-46 mo | n/a | Time Served |
| Yorkis Chevalier | 29 | S4; Ct. 1 | II | 41-51 mo | n/a | Time Served |
| Jose Gutierrez | 21 | S3; Ct. 40 | I | 87-108 mo | n/a | 48 mo |
| Victor Colon | 25 | S3; Ct. 40 | I | 87-108 mo | n/a | 12 mo + 1 day |

---

[3] As reflected in the PSR.

| Nijmah Marte | 23 | S3; Ct. 40 | I | 87-108 mo | n/a | Time Served |

*denotes leadership
+denotes jailhouse misconduct

**VIII.  A SUBSTANTIAL SENTENCE IS WARRANTED IN THIS CASE**

A sentence within the Stipulated Guidelines Range of 219-251 months' imprisonment is sufficient but not greater than necessary based on the nature, circumstances, and seriousness of the offense; the defendant's history and characteristics; and the need for the sentence imposed to provide just punishment, to afford adequate deterrence to this defendant and others, and to protect the public from additional crimes by the defendant. The Government acknowledges that this is a request for a profoundly serious sentence. But, as described above, the defendant committed repeated acts of ruthless violence with little more than a financial motive. He harmed his community through his drug dealing and firearms use and has shown no remorse. His criminal conduct has persisted in jail and there is a stark need to protect the community from his future crimes where he has demonstrated little ability to control his impulses or abide by the law.

Unquestionably, the defendant's crimes were extremely serious. The defendant voluntarily joined a violent organization that prided itself of terrorizing the community by selling drugs, carrying out drug-related violence, and committing high profile robberies at a remarkable profit margin. The defendant participated directly. He attempted to kill rival narcotics traffickers by shooting at them. While it appears that he missed, the fact that he did not take a life that day is pure luck. His intended targets are lucky to be alive, as are the innocent bystanders. In this very case, an innocent bystander was killed and others were injured by members of OED who recklessly—and with little regard for human life—used deadly force to resolve minor disputes or to gain clout on social media.  In addition, he committed multiple gunpoint robberies, which terrify victims and always create the possibility that the firearms will be used.  Crimes like those committed by the defendant rob citizens of their right to feel safe in their communities.

The defendant didn't stop with gun crime. He sold fentanyl on the streets of New York, contributing to the proliferation of a drug that has caused countless overdose deaths. As the Court is aware, fentanyl is a particularly dangerous substance, even small amounts of which can prove to be fatal. Indeed, according to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022, it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid, with 71,450, or 66.5%, involving synthetic opioids, primarily from fentanyl or fentanyl analogues.[4] In 2023, for the first time in U.S. history, the overdose death

---

[4] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at*  https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text= Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022;  *see also United States v. Herrera*, No. 21 Cr. 750 (LJL), 2023 WL 3862695, at *1 (S.D.N.Y. June 7, 2023) ("[Fentanyl] can be extraordinarily dangerous and is lethal.  In 2020, the National Institutes

rate topped 112,000 in a 12-month period, according to the Center for Disease Control and Prevention, with young people and people of color among the hardest hit.[5] Drug policy experts and people living with addiction say the magnitude of this calamity now eclipses every previous drug epidemic, from crack cocaine in the 1980s to the prescription opioid crisis of the 2000s.[6] That the defendant and other members of OED were trafficking other narcotics in addition to fentanyl only exacerbates his conduct. Recent studies show that the nation's fentanyl epidemic has given rise to a broader trend in which those addicted to opioids turn to using multiple substances, *i.e.*, "polysubstance use."[7]

Specific deterrence and incapacitation are critical concerns in this case. This offense does not represent a single lapse of judgment or mistake. This conviction represents dozens of crimes committed over the course of years. Arrests, arrests of his co-conspirators, seizures, and threats to his own safety were not enough to deter the defendant. Even imprisonment during the pendency of this case has been insufficient to deter the defendant from continued criminality. After he was arrested, the defendant did not reform. Instead, he attempted to fake cognitive impairment in order to interfere with the prosecution of his case and to potentially obtain a more lenient plea or sentence. He also was sanctioned by BOP five times, twice for possessing a "hazardous tool"— meaning a weapon. Significantly, the two sanctions for possessing a hazardous tool came ***after*** he claimed to have suffered a head injury that made him generally unresponsive. The defendant engaged in extensive, repeated violence at a young age but has managed to escape true accountability. He should receive a sentence that both protects the public from additional criminal activity, and that is significant enough to convince the defendant to cease his criminal activity.

General deterrence is also a significant consideration. Members of OED have murdered, shot, robbed, and sold drugs for years. OED members have terrorized Washington Heights, other parts of Manhattan, and New York-area prisons. They have killed innocent bystanders, committed violent robberies, and injected deadly drugs into their neighborhood. They have glamorized a lifestyle of violence and drug use, promoted crime, and encouraged lawlessness. And, in many instances, they have done all of this by taking advantage of the relative youth of many of their members; the gang continues to recruit additional members from the Washington Heights area, including members under the age of 18. In this case, 24 members of OED are being held

---

of Health reported that synthetic opioids, primarily fentanyl, caused the most drug overdose deaths in the United States, with approximately 56,516 such deaths documented that year. Fentanyl can "wreak[] havoc on entire communities . . . [and] destroy[] lives.").

[5] https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction#:~:text=In%202023%20the%20overdose%20death,for%20Disease%20Control%20and%20Prevention.

[6] *Id.*

[7] *See* 'A Monster': Super Meth and Other Drugs Push Crisis Beyond Opioids, N.Y. Times, (November 13, 2023), https://www.nytimes.com/2023/11/13/health/polysubstance-opioids-addiction.html?searchResultPosition=1 ("Over the last three years, studies of people addicted to opioids (a population estimated to be in the millions) have consistently shown that between 70 and 80 percent also take other illicit substances, a shift that is stymieing treatment efforts and confounding state, local and federal policies.").

responsible as a racketeering enterprise for at least some of their crimes. Given the number of defendants and the scope of the violence, this case is being watched in the community. Teenagers in Washington Heights considering whether to join OED—or considering whether to get out of OED—will likely be aware of the sentences imposed in this case, and will take them into account when deciding whether to join OED. As to this defendant and all the other defendants in this case, the Court should impose a sentence that sends the right message of deterrence to all those individuals: joining a deadly gang such as OED will not be tolerated.

## IX. CONCLUSION

The Government respectfully requests that the Court impose a sentence within the Stipulated Guidelines Range of 219 to 252 months' imprisonment.

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney

by: */s/*_____
Kevin Mead
Sarah L. Kushner
Ashley C. Nicolas
Alexandra S. Messiter
Assistant United States Attorneys
(212) 637-2211/2676/2467/2544

cc: Dawn Florio and Declan Murray, Esq. (by ECF)